AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ DISTRICT OF __MASSACHUSETTS__

UNITED STATES OF AMERICA

V.

LENIN FRIAS,
a/k/a "MORENO"

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 2002 M 0471 RBC

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __1/3/01 through 10/12/01__ in __Bristol__ county, in the _____ District of __Massachusetts__ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally conspire with others to distribute, and possess with intent to distribute, 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance,

in violation of Title __21__ United States Code, Section(s) __846 & 841(a)(1)__.

I further state that I am a(n) __DEA special agent__ and that this complaint is based on the following
                                    Official Title
facts:

See attached Affidavit of Special Agent Christopher Grenier

*DOCKETED*

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

12-09-2002  at 1:10 pm                at            Boston, MA
Date                                                 City and State

Robert B. Collings,
United States Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

Suffolk, ss.                                  Boston, Massachusetts
                                              December 9, 2002

### AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER GRENIER

I, Special Agent Christopher Grenier, depose and state as follows:

1. For the past 12 years, I have been employed as a special agent of the Drug Enforcement Agency ("DEA") assigned to the New England Field Division.

2. During my career as a law enforcement officer, I have received specialized training regarding narcotics identification, narcotics investigations, money laundering, electronic surveillance, and other investigative techniques. I also have had extensive experience in the investigation of the activities of narcotics traffickers. Since becoming a DEA special agent, I have participated in numerous narcotics investigations as a case agent and in other roles. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations. I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and participating in court-authorized interceptions of wire and electronic communications. Based on my training and experience, I am familiar with the appearance of narcotics sold on the street, including cocaine and cocaine base (also known as "crack"), and the manner in which such narcotics

are packaged and sold.

3.   I submit this affidavit in support of a complaint charging LENIN FRIAS, a/k/a "Moreno" ("FRIAS"), with conspiracy to distribute and to possess with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 846 & 841.

4.   The information contained in this affidavit is based on my own observations or has been related to me by law enforcement officers involved in the investigation.  This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it sets forth only those facts that I believe are necessary and sufficient to establish probable cause to charge LENIN FRIAS with a violation of 21 U.S.C. §§ 846 & 841.

5.   This investigation commenced in December 2000, when I received information, including information from a cooperating witness ("CW"), that FRIAS regularly sold large quantities of heroin in the Providence, Rhode Island, and Fall River, Massachusetts areas.

6.   **January 3, 2001 sale of 9.9 grams of heroin.**  On January 3, 2001, DEA Special Agent Todd Shea met with a cooperating witness ("CW") and drove with CW to the Home Depot in Seekonk, Massachusetts.  Along the way, Special Agent Shea directed CW to call Carlos Francisco Nunez-Delemos ("Nunez") to

discuss arrangements for a controlled purchase of heroin from Nunez and FRIAS. Juan Gomez ("Gomez") answered Nunez's phone and said that Nunez would arrive momentarily. CW made approximately five more calls to Nunez's phone during the period 3:30 p.m. to 5:18 p.m. and spoke each time with Nunez or FRIAS; during these calls, Nunez and FRIAS agreed to meet CW in the Home Depot parking lot and later gave CW updates on their expected arrival time. (These calls were made in Special Agent Shea's presence but were not recorded.)

7. At approximately 5:19 p.m., FRIAS and Gomez arrived at the Home Depot parking lot and got into the car in which CW and Special Agent Shea were waiting. (Special Agent Shea recognized FRIAS from a January 2001 Cranston Police arrest photograph and recognized Gomez from a July 1997 Providence Police Department arrest photograph.) CW introduced Special Agent Shea as a prospective drug purchaser. After brief conversation with Special Agent Shea, FRIAS handed Gomez a small plastic bag and got out of the car. His place in the undercover car was taken by Nunez, who pulled up shortly afterwards in a green Volkswagen. (Special Agent Shea identified Nunez from an April 1996 Fall River Police Department arrest photograph.) Special Agent Shea asked Nunez if he had a "little taste" for Special Agent Shea, and Nunez replied that it was all in the bag. Nunez then took from Gomez the small plastic bag that Gomez had earlier received

3

from FRIAS and gave the bag to CW, who handed it to Special Agent Shea. Inside the bag was a white powder substance compressed into a bullet shape that the DEA Laboratory later identified as 9.9 grams of 94% pure heroin. In exchange for the heroin, Special Agent Shea handed Nunez $1,000. The entire meeting inside the car was consensually tape recorded.

8. **January 31, 2001 sale of 31 grams of heroin**. On January 31, 2001, at approximately 11:45 a.m., Special Agent Shea had a consensually tape recorded conversation with FRIAS in which FRIAS offered to sell Special Agent Shea 30 "windows" at 2:00 p.m. at the Pub 99 Restaurant on Route 114A in Seekonk. Special Agent Shea understood "windows" to be a code word for heroin. At approximately 2:50 p.m., FRIAS entered the Pub 99 Restaurant and met Special Agent Shea and Task Force Agent Robert Andrade, who was posing as Special Agent Shea's drug associate. FRIAS and Special Agent Shea had a brief conversation about the quality of the heroin FRIAS had sold to Special Agent Shea on January 3, 2001, and about the quality of the heroin that FRIAS had for sale that day. The two men then entered the bathroom together, where FRIAS asked for and received permission to search Special Agent Shea to ensure that Special Agent Shea was not a police officer. (FRIAS's search failed to uncover both the Kel transmitting device and micro-cassette recording device that Special Agent Shea was wearing.)

9.  The two men then left the restaurant and entered a yellow Volkswagen, where a Hispanic man was sitting in the driver's seat. FRIAS introduced the man as "Jose." Jose retrieved a package from the center dashboard area below the radio and handed it to Special Agent Shea. After inspecting the package, which contained 31 grams of heroin, Special Agent Shea left the van, obtained $2,500 from Task Force Agent Andrade (who was still inside the restaurant), returned to the van, and exchanged the money for the drugs. The meeting between FRIAS and Special Agent Shea was consensually recorded by Special Agent Shea.

10. **May 2, 2001 sale of 40 grams of heroin.** On May 2, 2001 at approximately 10:45 a.m., FRIAS and Special Agent Shea had a consensually recorded conversation about a possible heroin sale. FRIAS said, among other things, that he could provide Special Agent Shea with a sample of the heroin later that day. The two had several other conversations over the course of the day and eventually agreed to meet at the Pub 99 Restaurant in Seekonk. At approximately 4:30 p.m., FRIAS and Jose drove up to the Pub 99 Restaurant in a yellow Volkswagen and parked next to Special Agent Shea, who was waiting in his car. FRIAS handed Special Agent Shea a small plastic baggie containing 0.58 grams of brown powdered heroin. Special Agent Shea said he wanted a "bullet" (i.e. approximately 10 grams of heroin compressed into a bullet

shape) like the kind FRIAS had first sold him. FRIAS said that the heroin was not coming that way any more, but that he had 40 more grams of loose powdered heroin back in Rhode Island that he could sell to Special Agent Shea. FRIAS asked Special Agent Shea to follow him to Johnston, Rhode Island, to pick up the additional heroin, but Special Agent Shea said he would wait in Massachusetts. FRIAS then said that Jose would fetch the heroin and return in 30 minutes.

11. At approximately 5:40 p.m., after FRIAS called Special Agent Shea several times to update him on the heroin's likely arrival time, FRIAS and Jose returned to the Pub 99 Restaurant, entered Special Agent Shea's car, and gave him a package containing 40 grams of 56% pure heroin. Special Agent Shea then called Task Force Agent Andrade, who drove to the restaurant and gave Special Agent Shea $3,300, which Special Agent Shea gave to FRIAS.

12. **October 12, 2001 sale of 19.4 grams of heroin.** On October 12, 2001, Special Agent Shea and FRIAS had a consensually recorded conversation in which FRIAS agreed to sell Special Agent Shea 20 "windows" (i.e. grams of heroin) for $90 per gram. FRIAS also said that if Special Agent Shea liked the heroin, FRIAS could provide another 200 grams the following week at the same price. Later that day, FRIAS told Special Agent Shea that he would sell him 20 grams of heroin at 4:30 p.m. at the Newport

Creamery in Seekonk. At approximately 4:40 p.m., Special Agent Shea received a call from Jose; the two spoke several times and agreed to change the location of the sale to TGI Friday's parking lot at 1105 Fall River Avenue in Seekonk.

13. At approximately 5:15 p.m., Special Agent Shea observed Jose drive into the TGI Friday's parking lot in a red Ford Taurus. Special Agent Shea approached the car and asked Jose where FRIAS was (referring to FRIAS by his alias, "Moreno"). Jose said FRIAS was at home. (Jose also referred to FRIAS as "Moreno.") Jose then gave Special Agent Shea a package containing 19.4 grams of 57% pure heroin. When Special Agent Shea complained that the heroin was not the same quality as in the past, Jose called FRIAS and handed the phone to Special Agent Shea. Special Agent Shea told FRIAS that the heroin did not look good; FRIAS assured Special Agent Shea that the quality was indeed good. Special Agent Shea agreed to try the heroin later and gave Jose $1,800 in exchange for the drugs.

14. Based upon the foregoing, and based upon my training and experience, there is probable cause to believe that LENIN FRIAS has knowingly and intentionally conspired with others to distribute and to possess with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 United States Code, Sections 846 & 841(a)(1).

I, having signed this affidavit under oath, as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

CHRISTOPHER GRENIER
Special Agent
Drug Enforcement Administration


Sworn to before me on
this 9th day of December, 2002.

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE